## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JANE DOE,

     Plaintiff,

v.

UR M. JADDOU, *in her official capacity as Director of United States Citizenship and Immigration Services*,
TROY A. MILLER, *in his official capacity as Senior Official Performing the Duties of the Commissioner of United States Customs and Border Protection*, and
ALEJANDRO MAYORKAS, *in his official capacity as Secretary of Homeland Security*,

     Defendants.

Civil Action No. TDC-24-0650

## MEMORANDUM OPINION

Plaintiff Jane Doe, an Iraqi refugee, has filed a civil action against the Director of United States Citizenship and Immigration Services ("USCIS"); the Senior Official Performing the Duties of the Commissioner of United States Customs and Border Protection ("CBP"); and the Secretary of Homeland Security ("the Secretary"), alleging a violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701–706 (2018), arising from Defendants' policy that individuals previously admitted to the United States as refugees are inadmissible for reentry to the United States without a refugee travel document. Doe has filed a Motion for a Preliminary Injunction, which is fully briefed. On April 29, 2024, the Court held a hearing on the Motion. The Court now issues its findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(2). For the reasons set forth below, the Motion will be GRANTED.

## FINDINGS OF FACT

### I.   The Policy

The Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101–1537 (2018), governs

the admission of foreign nationals to the United States. The Refugee Act, Pub. L. 96–212, 94 Stat.

102 (1980), amended the INA to address the admission of refugees into the United States and

granted to the Attorney General the discretionary authority to admit refugees into the United

States:

> [T]he Attorney General may, in the Attorney General's discretion and pursuant to such regulations as the Attorney General may prescribe, admit any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible (except as otherwise provided under [8 U.S.C. § 1157(c)(3)]) as an immigrant under [the INA].

8 U.S.C. § 1157(c)(1).

The Refugee Act exempts refugees from at least two statutory requirements. First, the INA

requires that:

> Except as otherwise specifically provided in [the INA], any immigrant at the time of application for admission—
>
> (I)    who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by [the INA], and a valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under [8 U.S.C. § 1181(a)], or
>
> (II)   whose visa has been issued without compliance with the provisions of [8 U.S.C. § 1153],
>
> is inadmissible.

8 U.S.C. § 1182(a)(7)(A)(i). The Refugee Act states that the provisions of § 1182(a)(7)(A) "shall

not be applicable to any alien seeking admission to the United States under [§ 1157(c)]." Refugee

Act § 207, 8 U.S.C. § 1157(c)(3).

2

Second, the INA requires that:

Except as provided in [8 U.S.C. § 1181(b) and (c)] no immigrant shall be admitted into the United States unless at the time of application for admission he (1) has a valid unexpired immigrant visa or was born subsequent to the issuance of such visa of the accompanying parent, and (2) presents a valid unexpired passport or other suitable travel document, or document of identity and nationality, if such document is required under the regulations issued by the Attorney General.

8 U.S.C. § 1181(a). The Refugee Act states that the provisions of § 1181(a) "shall not apply to an alien whom the Attorney General admits to the United States under [8 U.S.C. § 1157]." Refugee Act § 202, 8 U.S.C. § 1181(c).

The Homeland Security Act, Pub. L. 107–296, 116 Stat. 2135 (2002), transferred the authorities relating to refugees from the Attorney General to the Secretary of Homeland Security, *id.* at 2177-78, 2311, and the authority to conduct "adjudications of asylum and refugee applications" to the Director of the Bureau of Citizenship and Immigration Services within the Department of Homeland Security ("DHS"), now the Director of USCIS, *id.* at 2196. *See* 6 U.S.C. § 557 (2018); *Mestanek v. Jaddou*, 93 F.4th 164, 170-71 (4th Cir. 2024) (describing the transfer of the administration of federal immigration laws to USCIS and other components within DHS).

In 1997, the Immigration and Naturalization Service ("INS"), the predecessor agency to USCIS, promulgated regulations governing the issuance of refugee travel documents ("RTDs"). 8 C.F.R. §§ 223.1–223.3 (2023); *see* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312 (Mar. 6, 1997). These regulations ("the RTD Regulations") require that "a person who holds refugee status" must have "a refugee travel document to return to the United States after temporary travel abroad unless he or she is in possession of a valid advance parole document." 8 C.F.R. § 223.1(b). An RTD applicant "must submit the application while in the United States and in valid refugee status." *Id.* § 223.2(b)(2)(i). However, a USCIS officer may "as a matter of discretion . .

3

. accept and adjudicate an application for a refugee travel document from an alien who had previously been admitted to the United States as a refugee" and "who departed from the United States without having applied for such refugee travel document, provided the officer":

(A)     Is satisfied that the alien did not intend to abandon his or her refugee or asylum status at the time of departure from the United States;

(B)     The alien did not engage in any activities while outside the United States that would be inconsistent with continued refugee or asylum status; and

(C)     The alien has been outside the United States for less than 1 year since his or her last departure.

*Id.* § 223.2(b)(2)(ii).  The decision to approve or deny an RTD application is "an exercise of discretion," *id.* § 223.2(e), and the denial of an RTD application may be appealed, *id.* § 223.2(g). RTDs are valid for one year, *id.* § 223.3(a)(2), and may not be extended, *id.* § 223.3(c).  Even with an RTD, a refugee returning to the United States is to be "examined as to his or her admissibility under the" INA and referred for removal proceedings if deemed inadmissible.  *Id.* § 223.3(d)(2).

On November 23, 1999, Bo Cooper, General Counsel of the INS, issued a memorandum on readmitting refugees without RTDs.  Bo Cooper, Memorandum re:  Readmission of Asylees and Refugees Without Travel Documents (Nov. 23, 1999) ("the Cooper Memorandum"), Mot. Prelim. Inj. Ex. C-1, ECF No. 25-4.  The Cooper Memorandum states multiple times that the lack of an RTD renders a returning refugee inadmissible to the United States:

Refugees . . . who leave the United States without permission or with expired refugee travel documents are inadmissible under [8 U.S.C. § 1182(a)(7)] of the [INA].

\* \* \*

A refugee . . . who fails to obtain [an RTD] cannot be admitted under the [INA]. Therefore, . . . refugees who leave the United States without permission, or whose refugee travel document has expired, are rendered inadmissible by their action.

\* \* \*

4

> The lack of a valid and unexpired refugee travel document renders a returning refugee . . . inadmissible, and he or she may not be readmitted to his prior status without it.

Cooper Mem. at 2, 5. The Cooper Memorandum also provides that when officers examine refugees with valid RTDs for admissibility, they "should be mindful of [8 U.S.C. § 1157(c)]," which "sets forth the grounds of inadmissibility under [8 U.S.C. § 1182] that are not applicable to refugees and those that may be waived in the case of refugees." *Id.* at 3. It further notes that "it is often appropriate for INS to facilitate the return of refugees . . . to the United States when they are stranded overseas due to the absence or expiration of a refugee travel document," discusses the procedure for applying for a discretionary grant of an RTD outside of the United States or at a port of entry, and states that a refugee who fails to obtain an RTD within one year of departure from the United States or who allows an RTD to expire may be considered for "a discretionary grant of parole," but notes that parole does not constitute readmission to the United States or to refugee status. *Id.* at 4-5. The Cooper Memorandum is required reading for USCIS International Operations Officers who will be charged with adjudicating parole requests.

## II.    Plaintiff Jane Doe

Plaintiff Jane Doe, proceeding under a pseudonym, is an Iraqi national residing in Iraq. Doe's father had worked in Iraq with United States government or military personnel as a translator, and in 2006, Doe's father was threatened and then murdered by Shiite militants for his work. Shiite militants later threatened to harm Doe due to her father's affiliation with the United States. In 2015, Doe, her husband, and her two children applied for admission to the United States as refugees. In 2016, USCIS granted the refugee applications of Doe and her children but deferred a decision as to Doe's husband. In June 2016, Doe decided to travel to the United States with her children while they awaited a final decision on her husband's refugee application.

Doe and her children did not remain in the United States for long.  Between June and July 2016, Doe's husband received a death threat from Shiite militants—a letter with a bullet enclosed—resembling the threat issued to Doe's father before he was killed.  Around that time, USCIS denied the refugee application filed by Doe's husband.  Fearing for her husband's safety, wanting to comfort him, and seeking to provide her children with the opportunity to see their father, Doe returned to Iraq with her children at the end of July 2016.  Prior to her departure, Doe inquired about procedures for returning to the United States and was informed that she would need to apply for travel documents, that the process could take several months, and that she could apply for the documents while abroad.  Within three weeks of her return to Iraq, Doe sought assistance from the International Refugee Assistance Project ("IRAP") with applying for RTDs for herself and her two children.

On July 10, 2017, and with assistance from IRAP and the law firm of Holwell Shuster & Goldberg LLP ("HS&G"), Doe submitted to USCIS I-131 forms ("the RTD applications") through which she applied for RTDs for her and her children.  In September 2017, Doe and her husband had a third child in Iraq.  In April 2018, USCIS requested additional information regarding the RTD applications, and in June 2018, USCIS interviewed Doe and her two older children regarding the RTD applications at the U.S. Embassy in Baghdad.  From 2017 through 2021, HS&G sent five separate requests for expedited consideration of the RTD applications.  In July 2020, HS&G learned that the USCIS office to which Doe had submitted the RTD applications had closed, that the RTD applications had been forwarded to a different USCIS office, and that they remained under consideration.  On August 31, 2022, over five years after Doe first filed the RTD applications, she filed a civil action challenging USCIS's delay in processing them.

Beginning in December 2022, USCIS began to resolve the RTD applications, with mixed results for Doe and her family. In December 2022, USCIS granted the RTD application filed on behalf of Doe's daughter and requested fingerprinting of Doe's son, which occurred in March 2023. USCIS then granted the RTD application filed on behalf of Doe's son in April 2023. However, in January 2023, USCIS denied Doe's RTD application. In April 2023, Doe filed a motion to reopen and reconsider the denial of her RTD application, and later in 2023, she requested that the motion be expedited. On May 10, 2023, Doe's two older children received their RTDs, which are valid only until May 9, 2024.

Doe has alleged various difficulties arising out of her inability to receive an RTD and return to the United States. Fearing the Shiite militia who killed her father and threatened her husband, Doe relocated several times and homeschooled her children before 2020. In 2020, Shiite militants threatened Doe's husband with harm if he failed to divorce her, but after he refused to do so, those militants required him to separate from Doe and take Doe's two older children. As a result, those children are now separated from Doe and no longer receive any schooling. In September 2021, Doe was assaulted and injured by Shiite militants, accused of spying for the United States, and told that she was on a hit list. Doe moved to Baghdad after that assault and now lives with only her youngest child in the home of a female relative. Doe lives in fear of the Shiite militants, who are growing in influence within Iraq and are becoming increasingly hostile towards the United States due to recent air strikes conducted by the United States against those groups. Since returning to Iraq, and as she has lived in fear, Doe has developed asthma and depression.

## III.    Procedural History

On March 4, 2024, Doe filed the Complaint in this case. On March 13, 2024, Doe filed a Motion for a Preliminary Injunction requesting that the Court enjoin Defendants (collectively, "the

Government") from enforcing, as to Doe, its policy under the RTD Regulations and the Cooper Memorandum that individuals previously admitted to the United States as refugees who have since departed are required to have a valid RTD in order to be readmitted to the United States ("the RTD Policy"). On March 26, 2024, pursuant to a schedule set by the Court, the Government filed a memorandum in opposition to the Motion. On April 2, 2024, Doe filed a reply brief. On April 19, 2024, pursuant to the Court's Order, the Government filed a supplemental memorandum in opposition to the Motion to address the merits of Doe's claim, to which Doe filed a supplemental reply brief on April 24, 2024. On April 29, 2024, the Court held a hearing on the Motion.

## CONCLUSIONS OF LAW

In the Motion, Doe seeks a preliminary injunction based on her claim that the RTD Policy (1) is "not in accordance with law" and "in excess of statutory . . . authority," in violation of 5 U.S.C. § 706(2)(A), (C), in that it is inconsistent with certain provisions of the INA, 8 U.S.C. §§ 1157(c)(3), 1181(c); and (2) is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A). The Government counters that pursuant to the INA and the APA, Doe's claim is not subject to judicial review, that it is time-barred, that the RTD Policy is a permissible construction of the INA, and that Doe cannot meet the other required elements for a preliminary injunction to issue in her favor.

## I.     Legal Standard

A plaintiff seeking a preliminary injunction must establish (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that the proposed injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see HIAS, Inc. v. Trump*, 985 F.3d 309, 318-19 (4th Cir. 2021). A moving party must satisfy each requirement. *Pashby v. Delia*, 709 F.3d 307, 320-21 (4th Cir. 2013).

8

## II.    Availability of Judicial Review

As a threshold issue, the Government argues that judicial review of Doe's claim is barred under the APA for two reasons: (1) there is a statute that "preclude[s] judicial review," 5 U.S.C. § 701(a)(1), specifically, the INA, 8 U.S.C. § 1252(a)(2)(B)(ii); and (2) Doe's claim seeks review of an "agency action" that "is committed to agency discretion by law, 5 U.S.C. § 701(a)(2).  Doe responds that the INA statutorily precludes only discretionary decisions on individual applications, not challenges to immigration policy, and that the RTD Policy is subject to specific statutory standards such that it is not "committed to agency discretion by law" under the APA.

The APA "embodies a 'basic presumption of judicial review'" and "instructs reviewing courts to set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019) (citations omitted).  The APA, however, does not permit judicial review "'to the extent that' a relevant statute precludes it . . . or the agency action is 'committed to agency discretion by law.'" *Id.* (quoting 5 U.S.C. §§ 706(2)(A), 701(a)(1), (2)).

### A.    INA

The Government argues that the INA specifically bars judicial review of Doe's claim.  In a subsection entitled "Denials of discretionary relief," the INA provides that:

Notwithstanding any other provision of law . . . and except as provided in [8 U.S.C. § 1252(a)(2)(D)], and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—

(i)    any judgment regarding the granting of relief under [8 U.S.C. §§] 1182(h), 1182(i), 1229b, 1229c, or 1255. . . , or

(ii)    any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under [8 U.S.C. § 1158(a)].

9

8 U.S.C. § 1252(a)(2)(B).

The Government contends that Doe's claim is barred by 8 U.S.C. § 1252(a)(2)(B)(ii) because its decision is based on its discretionary authority. Specifically, the Government argues that the challenged decision is grounded in the Government's authority to admit refugees under 8 U.S.C. § 1157(c)(1), which states that the Government "may, in the Attorney General's discretion and pursuant to such regulations as the Attorney General may prescribe, admit any refugee," and in 8 C.F.R. § 223.2(e), which provides that "USCIS may approve or deny a request for a reentry permit or refugee travel document as an exercise of discretion." The latter source of discretionary authority does not render the RTD Policy unreviewable because discretionary authority set forth in a regulation, as opposed to a statute, does not provide a basis for proscribing judicial review under § 1252(a)(2)(B), which refers "to statutory, but not to regulatory, specifications." *See Kucana v. Holder*, 558 U.S. 233, 237, 253 (2010).

In arguing that its discretionary authority under § 1157(c)(1) renders the RTD Policy unreviewable, the Government relies on *Patel v. Garland*, 142 S. Ct. 1614 (2022), in which USCIS denied the plaintiff's application for adjustment of status under 8 U.S.C. §§ 1255(i)(2)(A) and 1182(a)(6)(C)(ii)(I) because it concluded that the plaintiff's false statement in an application for a driver's license rendered him statutorily inadmissible for adjustment of status. *Patel*, 142 S. Ct. at 1619-20. In finding that the plaintiff's challenge to this denial was not subject to judicial review pursuant to § 1252(a)(2)(B)(i), the United States Supreme Court held that "[f]ederal courts lack jurisdiction to review facts found as part of discretionary-relief proceedings under § 1255 and the other provisions enumerated in § 1252(a)(2)(B)(i)." *Patel*, 142 S. Ct. at 1622, 1627. The present case, however, does not involve a statutory provision enumerated in § 1252(a)(2)(B)(i).

The Government also cites *Shaiban v. Jaddou*, __ F.4th __, No. 21-2010, 2024 WL 1422735 (4th Cir. Apr. 3, 2024), in which the United States Court of Appeals for the Fourth Circuit, citing *Patel*, held that § 1252(a)(2)(B)(ii) barred judicial review of the plaintiff's claim that USCIS improperly denied his application for adjustment of status under 8 U.S.C. § 1159(b) based on USCIS's finding that the plaintiff was inadmissible on terrorism grounds. *Shaiban*, 2024 WL 1422735, at *1-2. In so ruling, the court focused on the language of § 1159(b), which provides that the "Secretary of Homeland Security or the Attorney General, in the Secretary's or the Attorney General's discretion and under such regulations as the Secretary or the Attorney General may prescribe, may adjust" the status of an alien granted asylum "to the status of an alien lawfully admitted for permanent residence" if certain enumerated statutory conditions are met. 8 U.S.C. § 1159(b); *Shaiban*, 2024 WL 1422735, at *3.

Here, however, Doe is not challenging the individualized, discretionary determination of whether she should be granted an RTD or admission to the United States. Rather, Doe contests USCIS's broader policy that a returning refugee without an RTD is inadmissible to the United States. Courts have long drawn a distinction between challenges to individualized, discretionary determinations, which are not subject to judicial review under § 1252(a)(2)(B)(ii), and challenges to USCIS policies based on claims that they are not supported by proper legal authority. For example, in *Moore v. Frazier*, 941 F.3d 717 (4th Cir. 2019), a plaintiff challenged USCIS's denial of his I-130 petition to reclassify his non-citizen wife's immigration status based on their familial relationship on the grounds that USCIS erroneously applied a later version of the relevant statute, 8 U.S.C. § 1154. *Moore*, 941 F.3d at 720-21. The Fourth Circuit held that § 1252(a)(2)(B)(ii) did not bar judicial review because "Congress did not designate to USCIS's discretion the decision of which version of § 1154 would apply to I-130 Petitions pending at the time" that the statute was

11

amended. *Id.* at 723. Rather, that question "is entirely separate from any of the discretionary decisions" at issue in the adjudication of an I-130 petition under § 1154 and "instead involves a question of USCIS's statutory authority." *Id.*

Similarly, in *Zadvydas v. Davis*, 533 U.S. 678 (2001), cited in *Moore*, the Supreme Court held that § 1252(a)(2)(B)(ii) did not preclude judicial review of a claim that a provision of the INA permitting detention of immigrants determined to be a "risk to the community or unlikely to comply with the order of removal," 8 U.S.C. § 1231(a)(6), beyond a 90-day period following the entry of an order of removal, violated their constitutional rights. *Zadvydas*, 533 U.S. at 689. Although individual decisions about whether an immigrant poses a risk to the community may be discretionary, the Supreme Court reasoned that the claim at issue related to "the extent of the Attorney General's authority under the post-removal-period detention statute," which "is not a matter of discretion." *Id.* at 688.

Other Supreme Court opinions, also cited in *Moore*, further illustrate the distinction revealed by *Zadvydas* and *Moore*: that a claim that a policy or its application runs contrary to legal authority, as opposed to a claim that an individual decision on a specific application was erroneous, is not a discretionary action for which judicial review is barred by § 1252(a)(2)(B)(ii). In *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), in which the Court considered a claim that various INA provisions, including 8 U.S.C. § 1226, collectively provided detained immigrants with a right to periodic bond hearings, the Government argued that the claim was barred by 8 U.S.C. § 1226(e), which provides that the "discretionary judgment regarding the application of [§ 1226] shall not be subject to review," and that "[n]o court may set aside any action or decision . . . under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." 8 U.S.C. § 1226(e). *See Jennings*, 138 S. Ct. at 841 (plurality opinion). The Court nevertheless

permitted the claim to proceed because, as stated in a three-justice plurality opinion, it was a challenge to "the extent of the Government's detention authority under the 'statutory framework' as a whole" and was thus "not a matter of 'discretionary judgment,' 'action,' or 'decision.'" *Id.* (quoting *Demore v. Kim*, 538 U.S. 510, 517 (2003)); *see id.* at 859, 876 (Breyer, J., dissenting) (in a dissent joined by two other justices, assessing the claim on the merits). Similarly, in *Nielsen v. Preap*, 139 S. Ct. 954 (2019), in evaluating a challenge to the scope of the mandatory detention provisions in § 1226, the Court considered the claim based in part on the conclusion of a three-justice plurality that neither § 1226(e) nor 8 U.S.C. § 1252(b)(9), the latter of which limits judicial review of actions taken in removal proceedings to review of final orders, eliminated jurisdiction. *See Nielsen*, 139 S. Ct. at 961-63 (plurality opinion); *see id.* at 963-64 (majority opinion) (rejecting the claim on the merits); *see id.* at 976, 978 (Breyer, J., dissenting) (in a dissent joined by two other justices, assessing the claim on the merits). Citing *Jennings*, the plurality opinion concluded that § 1226(e) "does not block lawsuits over 'the extent of the Government's detention authority under the statutory framework as a whole,'" and that where the challenge "is not that the Government exercised its statutory authority in an unreasonable fashion," but to "the extent of the statutory authority that the Government claims," § 1226(e) does not strip courts of jurisdiction. *Id.* at 962 (plurality opinion) (citations omitted).

Here, Doe's claim differs from the claims barred from judicial review in *Shaiban* and *Patel*. While the plaintiffs in those cases challenged individualized decisions declining to grant adjustment of status to them, *see Shaiban*, 2024 WL 1422735, at \*5, *Patel*, 142 S. Ct. at 1620, Doe does not challenge USCIS's specific decision to decline to grant an RTD to her. Indeed, Doe acknowledges that USCIS retains "ultimate authority to grant or deny her readmission under § 1157(c)(1)." Reply at 3, ECF No. 30. Rather, as in *Moore* and *Zadvydas*, Doe's claim is that the

RTD Policy runs contrary to USCIS's statutory authority and thus does "not seek review of USCIS's exercise of discretion" but instead challenges "a question of USCIS's statutory authority." *Moore*, 941 F.3d at 724 (citing *Zadvydas*, 533 U.S. at 688). The INA provisions cited by Doe as proof that the Government lacks statutory authority to require an RTD as a condition of admissibility as applied to her are mandatory in nature and thus non-discretionary. *See* 8 U.S.C. §§ 1157(c)(3), 1181(c); *see also Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."). Notably, *Shaiban* specifically distinguished *Moore* by recognizing that while the claim in *Shaiban* was a challenge to "a fact-bound determination, which was subject to the overarching discretionary determination" not subject to judicial review under § 1252(a)(2)(B)(ii), the claim in *Moore* "involve[d] a question of USCIS's statutory authority" and an "inherent legal question" such that judicial review remained available. *Shaiban*, 2024 WL 1422735, at *4-5. Where Doe's claim is that the RTD Policy runs contrary to the statutory authority set forth in the INA, the Court finds that it is not barred by § 1252(a)(2)(B)(ii).

## B.    Committed to Agency Discretion by Law

Based in part on the analysis above, the Court also finds that Doe's claims are not "committed to agency discretion by law" within the meaning of the APA. 5 U.S.C. § 701(a)(2). The "committed to agency discretion by law" provision should be read "quite narrowly" and should be restricted to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (citation omitted). In *CASA de Maryland v. Department of Homeland Security* ("*CASA de Maryland v. DHS*"), 924 F.3d 684 (4th Cir. 2019), the Fourth Circuit concluded that the Acting Secretary of Homeland Security's

14

decision to rescind the Deferred Action for Childhood Arrivals ("DACA") policy was not "committed to agency discretion by law" under § 701(a)(2). *Id.* at 697-701. After reviewing Supreme Court precedent on § 701(a)(2), the court concluded that "an agency's expression of a broad or general enforcement policy based on the agency's legal interpretation is subject to judicial review," and that "DACA's rescission involves a broad enforcement policy, not an individual decision," thus taking the challenge to DACA's rescission outside the scope of § 701(a)(2). *Id.* at 699, 701.

As discussed above, Doe's claim is not that the Government erred in its decision to deny Doe's RTD application, or that it erred in any decision to bar her entry to the United States, both of which Doe acknowledges are subject to the agency's discretion. *See supra* part II.A. Rather, Doe argues that the RTD Policy itself runs contrary to applicable statutory authority and therefore is not permitted and not subject to agency discretion. *See* 8 U.S.C. §§ 1157(c)(3), 1181(c). Where Doe has identified specific statutory standards against which to judge the Government's action underlying her claim, and her challenge is to a broad agency enforcement policy rather than to an individual decision, *see CASA de Maryland v. DHS*, 924 F.3d at 699, 701, the Court will not find that her claim fails because it challenges a decision "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

For these reasons, the Court finds that neither 8 U.S.C. § 1252(a)(2)(B)(ii) nor 5 U.S.C. § 701(a) prevent judicial review of Doe's claim.

## III.   Statute of Limitations

Before addressing the merits, the Government further argues that Doe's claim is a facial challenge to the RTD Regulations and is therefore barred by the applicable statute of limitations. Doe responds that her claim is an as-applied challenge to the RTD Policy and was timely filed.

The Government relies on 28 U.S.C. § 2401(a), which provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a) (2018). "A cause of action governed by § 2401(a) accrues or begins to run at the time of 'final agency action.'" *Hire Order Ltd. v. Marianos*, 698 F.3d 168, 170 (4th Cir. 2012) (quoting *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 186 (4th Cir. 1999)). Final agency action occurs when "the agency has completed its decisionmaking process, and [when] the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). In *Hire Order*, the court held that where the plaintiffs brought a facial challenge to a 1969 revenue ruling by the Bureau of Alcohol, Tobacco, Firearms, and Explosives barring the sale of firearms at gun shows outside the state in which the firearms dealer held a license, "the limitations period begins to run when the agency publishes the regulation." *Hire Order*, 698 F.3d at 170 (quoting *Dunn-McCampbell Royalty Int., Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997)); *see also Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Security*, 983 F.3d 671, 681-82 (4th Cir. 2020) (holding that a 2016 facial challenge to 2008 rules promulgated by DHS relating to the issuance of visas for temporary workers was time-barred under § 2401(a)). As noted by the Government, the Supreme Court has granted certiorari over the question of when a facial challenge accrues for purposes of the limitations period in § 2401(a). *See Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.* ("*Corner Post*"), 144 S. Ct. 478 (2023).

Doe, however, asserts that the rule stated in *Hire Order* does not apply, and that her Complaint need not have been brought within six years after the RTD Regulations were published, because her claim is an as-applied challenge, not a facial challenge. In *Citizens for Responsibility & Ethics in Washington v. Federal Election Commission* ("*CREW*"), 971 F.3d 340 (D.C. Cir.

2020), the plaintiff, a non-profit organization, filed a complaint with the Federal Election Commission ("FEC"), in which it alleged that certain donations needed to be publicly disclosed under a 1980 FEC Rule and then filed a civil action alleging that the FEC misapplied the rule in dismissing the complaint. *Id.* at 343-44. The court rejected the argument that the claim was time-barred under § 2401(a) because it was brought more than six years after the Rule was adopted. *Id.* at 348. It instead found that the challenge was to the application of the 1980 FEC Rule to the plaintiff's complaint, and that the challenge was therefore timely because that more recent application of the Rule created a new basis for a cause of action. *Id.* at 348-49 (citing *Weaver v. Fed. Motor Carrier Safety Admin.*, 744 F.3d 142, 145 (D.C. Cir. 2014)).

Other United States Courts of Appeals have drawn similar distinctions in considering the limitations period in 28 U.S.C. § 2401(a). In *Dunn-McCampbell Royalty v. National Park Service* ("*Dunn-McCampbell*"), 112 F.3d 1283 (5th Cir. 1997), the National Park Service ("NPS") had promulgated 1978 regulations codified at 36 C.F.R. § 9B ("the 9B regulations") governing the exercise of certain private rights relating to minerals. *Dunn-McCampbell*, 112 F.3d at 1285. The plaintiff brought both facial and as-applied challenges to the 9B regulations in 1994 and asserted that the NPS had exceeded its constitutional and statutory authority in promulgating them. *Id.* at 1286. The court rejected the facial challenge as untimely under 28 U.S.C. § 2401 but noted that it was possible "to challenge a regulation after the limitations period has expired, provided that the ground for the challenge is that the issuing agency exceeded its constitutional or statutory authority," if the claimant can show "some direct, final agency action involving the particular plaintiff within six years of filing suit." *Id.* at 1287-88 (concluding that because the NPS had taken no such action against the plaintiff, the as-applied challenge also failed).

Similarly, in *Wind River Mining Corporation v. United States* ("*Wind River*"), 946 F.2d 710 (9th Cir. 1991), the Bureau of Land Management ("BLM") published a 1979 decision establishing various wilderness study areas ("WSAs") in California. *Id.* at 711. After the BLM informed plaintiff Wind River Mining Corporation ("Wind River") that it was barred from pursuing ore-extraction activities on its mining claim due to its location within a WSA, and after Wind River unsuccessfully pursued various administrative avenues in 1986 and 1987 to seek that the BLM declare its 1979 decision to be invalid, Wind River sued in federal court in 1989 to challenge the validity of the 1979 BLM decision. *Id.* at 711-12. In holding that the complaint was timely because the cause of action did not accrue until the BLM administrative proceedings were completed in 1987, the court contrasted "policy-based facial challenge[s]" to government action, which "must be brought within six years of the decision," with challenges to "the substance of an agency decision as exceeding constitutional or statutory authority," which the challenger may bring within six years of an "adverse application of the decision to the particular challenger." *Id.* at 715-16.

The Government does not dispute that the *Hire Order* rule does not apply to as-applied challenges. Indeed, at oral argument in *Corner Post*, the Government distinguished between facial and as-applied challenges by noting that for an as-applied claim, "the final agency action that you're challenging is the agency actually applying the regulation" against the plaintiff. *See* Transcript of Oral Argument at 50, *Corner Post*, 144 S. Ct. 478 (2023) (No. 22-1008).

As for whether Doe's claim is an as-applied challenge, the Supreme Court has cautioned that the "label is not what matters" in distinguishing facial from as-applied challenges, and that the "important point is" whether the "claim and the relief that would follow . . . reach beyond the particular circumstances" of the plaintiff in the case. *Doe v. Reed*, 561 U.S. 186, 194 (2010). An

as-applied challenge typically "does not seek to strike" the relevant provision "in all its applications." *Id.* When the Government applies a statute or regulation against a party, an as-applied challenge may include substantive arguments against the application of the statute or regulation, such as a challenge to the agency's authority based on its interpretation of a statute. *See Dunn-McCampbell*, 112 F.3d at 1287 (noting that "an agency's application of a rule to a party creates a new, six-year cause of action to challenge to the agency's constitutional or statutory authority"); *Wind River*, 946 F.2d at 716 ("We hold that a substantive challenge to an agency decision alleging lack of agency authority may be brought within six years of the agency's application of that decision to the specific challenger.").

Although the Complaint does not specifically label Doe's claim as a facial or as-applied challenge, it seeks an injunction barring the Government from "unlawfully applying" the "inadmissibility ground" in 8 U.S.C. § 1182(a)(7) "to Plaintiff," and from "enforcing" the requirement that refugees must have an RTD to return to the United States as set forth in 8 C.F.R. § 223.1(b) "against Plaintiff." Compl. at 13, ECF No. 1. Doe also seeks a declaratory judgment stating that the Government's policy "that Plaintiff is inadmissible" without an RTD is unlawful. *Id.* Doe does not seek relief that would bar the Government from applying the RTD Policy to all refugees but instead seeks individualized relief as to her in light of the denial of her RTD application. Because Doe does not seek relief that would require the Court to "reach beyond the particular circumstances of" her case, her claim is an as-applied challenge. *Doe*, 561 U.S. at 194.

Even having construed Doe's claim as an as-applied challenge, the Court must still determine when Doe's claim accrued and thus became reviewable under 28 U.S.C. § 2401(a). The parties dispute whether Doe's limitations period began to run in July 2016, when Doe first learned

of the RTD Policy; July 2017, when Doe first submitted the RTD applications; or in January 2023, when USCIS denied Doe's RTD application.

A "claim accrues when the plaintiff has a complete and present cause of action." *Fed. Energy Regul. Comm'n v. Powhatan Energy Fund, LLC*, 949 F.3d 891, 898 (4th Cir. 2020) (quoting *Gabelli v. Sec. & Exch. Comm'n*, 568 U.S. 442, 448 (2013)). "This occurs 'when the plaintiff can file suit and obtain relief.'" *Id.* (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). "Conduct becomes reviewable under the APA upon 'final agency action,'" or "when 'the agency has completed its decisionmaking process, and [when] the result of that process is one that will directly affect the parties.'" *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 186 (4th Cir. 1999) (quoting *Franklin*, 505 U.S. at 797). In *Deese v. Esper*, 483 F. Supp. 3d 290 (D. Md. 2020), the plaintiffs were discharged pursuant to a 1985 Department of Defense policy that members of the military who tested positive for human immunodeficiency virus ("HIV") were disqualified from service unless they could obtain a medical waiver on a case-by-case basis. *Id.* at 298-99. One of the plaintiffs discovered that he was HIV positive on April 1, 2014, he sought a formal request for a medical waiver on October 27, 2016, his request was rejected on March 15, 2017, and he was honorably discharged because of his HIV status in May 2017. *See id.* at 300-01. In rejecting the argument that the claim was time-barred under 28 U.S.C. § 2401(a), the court concluded that the plaintiff "did not suffer a legally cognizable injury, and accordingly could not challenge the Defendants' policies, until his May 2017 discharge." *Id.* at 307-08 & n.9.

Here, as in *Deese*, Doe's claim did not accrue when she first learned of the RTD Policy, or when she first applied for an RTD under the policy, but rather when she was ultimately denied the RTD on January 18, 2023. Prior to the denial, Doe had been awaiting a decision from USCIS since July 18, 2017. Where USCIS had granted an RTD for Doe's daughter and had issued a

request for evidence for Doe's son, it was not at all clear that USCIS would deny Doe's RTD application until January 18, 2023. Until that point, there was no final agency action, as the result of the agency decisionmaking process was not yet "one that [would] directly affect" Doe. *See Franklin*, 505 U.S. at 797. Therefore, for purposes of § 2401(a), Doe's claim accrued on January 18, 2023. *See Deese*, 483 F. Supp. 3d at 307-08 & n.9. Where Doe's Complaint was filed on March 4, 2024, less than six years after her RTD application was rejected on January 18, 2023, the Complaint is timely.

## IV.    Likelihood of Success on the Merits

Doe argues that her APA claim is likely to succeed on the merits for two reasons. First, Doe asserts that the RTD Policy is contrary to the INA because the INA unambiguously exempts refugees from being rendered inadmissible for reentry into the United States based on the lack of an RTD or other travel document. *See* 8 U.S.C. § 1157(c)(3). Second, Doe contends that the RTD Policy is arbitrary and capricious by failing to consider an important aspect of the problem it addresses, specifically, that the RTD Policy effectively terminates Doe's refugee status without adhering to the legal standard and procedures required under the INA. The Government argues that Doe's claim is unlikely to succeed because the RTD Policy is consistent with the INA and is entitled to deference.

### A.    "Not in Accordance With Law"

First, Doe argues that the RTD Policy is "not in accordance with law," and exceeds the Government's statutory authority under 5 U.S.C. § 706(2)(A) and (C), because its rule that a refugee seeking to return to the United States is inadmissible without an RTD conflicts with a statutory provision within the INA that unambiguously excludes refugees from being rendered inadmissible based on the refugee's lack of an entry document or travel document.    The

21

Government responds that the INA unambiguously grants the Government discretion to admit refugees and to promulgate regulations governing that process, and that the RTD Policy is permissible under that authority.

The two-step framework established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* ("*Chevron*"), 467 U.S. 837, 842-44 & n.9 (1984), applies to claims that agency action is not "in accordance with law" under § 706(2)(A). *See CASA de Maryland, Inc. v. Trump* ("*CASA de Maryland v. Trump*"), 971 F.3d 220, 236-37, 250 (4th Cir. 2020). It also applies to claims that an agency has acted "in excess of statutory . . . authority" under § 706(2)(C). *See Maryland Dep't of Health & Mental Hygiene v. Ctrs. for Medicare & Medicaid Servs.*, 542 F.3d 424, 427-28 (4th Cir. 2008).

At the first step, ("*Chevron* Step One"), a court must "give effect to the unambiguously expressed intent of Congress" if its intent "is clear," and if "a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue." *Chevron*, 467 U.S. at 842-43 & n.9. "Courts must exhaust 'all the traditional tools of construction,' emptying our interpretive toolboxes by considering the 'text, structure, history, and purpose' of a statute and to look to the agency only if the statute is 'genuinely ambiguous.'" *Cela v. Garland*, 75 F.4th 355, 361 (4th Cir. 2023) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)).

At the second step ("*Chevron* Step Two"), if "the court determines Congress has not directly addressed the precise question at issue," then where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. If "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate

a specific provision of the statute by regulation.  Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843-44.

Doe argues that the RTD Policy's requirement that she have a valid RTD to be admissible to the United States runs contrary to the INA.  Under the RTD Regulations, "a person who holds refugee status . . . must have a refugee travel document to return to the United States after temporary travel abroad . . . ." 8 C.F.R. § 223.1(b).  Under the Cooper Memorandum, an individual who has been granted refugee status in the United States "may travel abroad but must obtain a valid refugee travel document . . . to return to the United States," and "refugees . . . who leave the United States without permission or with expired refugee travel documents are inadmissible under [8 U.S.C. § 1182(a)(7)]."  Cooper Mem. at 2.

Doe argues that these components of the RTD Policy are inconsistent with three INA provisions that must be read together.  First, Doe focuses on 8 U.S.C. § 1182(a)(7)(A), which provides that "aliens who are inadmissible . . . are ineligible to receive visas and ineligible to be admitted to the United States," and includes among the categories of inadmissible individuals "any immigrant at the time of application for admission" who is "not in possession of a . . . valid entry document required by [the INA]" and "a valid unexpired passport, or other suitable travel document . . . ." 8 U.S.C. § 1182(a)(7)(A).  Doe next cites 8 U.S.C. § 1157(c)(3), which provides that § 1182(a)(7)(A) "shall not be applicable to any alien seeking admission to the United States under [§ 1157(c)]." *Id.* § 1157(c)(3).  Further, Doe cites 8 U.S.C. § 1181, which mandates that "no immigrant shall be admitted into the United States" without a "valid unexpired immigrant visa" and a "valid unexpired passport or other suitable travel document, or document of identity and nationality, if such document is required under the regulations," *id.* § 1181(a), but then states that this provision "shall not apply" to an individual admitted as a refugee, *id.* § 1181(c).  Taken

together, these statutory provisions are properly read to establish that refugees are not subject to the INA's provisions that render individuals inadmissible based on the lack of a valid entry or travel document. Such a result is sensible because refugees, which include those who are unable to return to and avail themselves of the protection of their native countries because of "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," may not have access to such documents. *Id.* § 1101(a)(42) (defining a "refugee" under the INA).

Doe's argument has force in that the mandatory language in § 1157(c)(3) and § 1181(c)— "shall not be applicable" and "shall not apply"—evinces a clear congressional intent that refugees are not subject to the mandatory grounds for inadmissibility in § 1182(a)(7)(A) and § 1181(a) relating to entry and travel documents. As a result, the Cooper Memorandum's statement that refugees "who leave the United States without permission or with expired refugee travel documents are inadmissible under [§ 1182(a)(7)]," Cooper Mem. at 2, is plainly "not in accordance with law," specifically § 1157(c)(3), in violation of the APA. *See* 5 U.S.C. § 706(2)(A).

The Government argues that its authority for the RTD Policy derives from a different provision, 8 U.S.C. § 1157(c)(1), which provides that "the Attorney General may, in the Attorney General's discretion and pursuant to such regulations as the Attorney General may prescribe, admit any refugee who . . . is admissible (except as otherwise provided under [§ 1157(c)(3)]) as an immigrant under [the INA]." 8 U.S.C. § 1157(c)(1). In general, the RTD Policy's establishment of a regime under which individuals already admitted as refugees are required to first obtain an RTD before departing the United States for travel abroad, and present it upon their return, would appear to fall within this authority. However, the Government's authority under § 1157(c)(1) must be construed in a manner that gives meaningful effect to the other subsections of § 1157, including

§ 1157(c)(3). *See New Process Steel, L.P. v. Nat'l Labor Rel. Bd.*, 560 U.S. 674, 680 (2010) (reading a statutory provision "to harmonize and give meaningful effect to all of the provisions" of a statute). This is especially the case where § 1157(c)(1) directly references § 1157(c)(3). Where the plain language of § 1157(c)(3) and § 1181(c) establishes Congress's directive that grounds of inadmissibility based on a lack of travel documents do not apply to refugees, a regulation providing that refugees are rendered inadmissible based on the lack of an RTD is inconsistent with that congressional intent.

The need for the Government's authority to promulgate regulations under § 1157(c)(1) to be applied in concert with § 1157(c)(3) is further illustrated by the fact that § 1157(c)(3) also provides that certain other grounds for inadmissibility in § 1182 may be waived after an investigation, but that others may not, including grounds for inadmissibility based on national security or terrorism concerns. 8 U.S.C. § 1157(c)(3) (barring waivers from inadmissibility under § 1182(a)(2)(C) and § 1182(a)(3)(A), (B), (C), and (E)). It cannot be fairly argued that the broad authority in § 1157(c)(1) over the admission of refugees would allow the Government to grant waivers in contravention of the requirements and limitations of § 1157(c)(3). Under the same reasoning, the Government cannot deem the lack of an RTD to be grounds for inadmissibility in direct contravention of § 1157(c)(3).

In opposing the Motion, the Government argues that Doe's reading would lead to the "absurd result" that refugees could travel in and out of the United States without any documentation. Opp'n at 4, ECF No. 35. The Court's ruling does not extend that far. Though as applied here, § 1157(c)(3) prevents the Government from deeming a returning refugee categorically inadmissible based on the lack of an RTD, the INA does not preclude the Government from adopting and implementing other provisions within the RTD Regulations and the Cooper

Memorandum, including those establishing the issuance and reliance on RTDs as the near-exclusive means by which a refugee may return to the United States. The Government may establish a regime under which RTDs are required for reentry unless refugees can satisfy alternative, more onerous requirements, potentially including provisions that would require the refugee to repeat parts of the original refugee admissions process. But the RTD Policy's rule, set forth in the Cooper Memorandum, that returning refugees without an RTD are categorically inadmissible, runs contrary to § 1157(c)(3) and is therefore "not in accordance with law." 5 U.S.C. § 706(2)(A).

In arguing that it may classify returning refugees as inadmissible without an RTD, the Government also cites international agreements relating to refugees which the United States has sought to implement through the Refugee Act, including the 1967 United Nations Protocol Relating to the Status of Refugees ("the 1967 Protocol"), Jan. 31, 1967, 19 U.S.T. 6224, and the 1951 United Nations Convention Relating to the Status of Refugees ("the 1951 Convention"), July 28, 1951, 189 U.N.T.S. 150, *reprinted in* 19 U.S.T. 6259. The United States was a signatory to the 1967 Protocol. 1967 Protocol, 19 U.S.T. at 6257. As the Supreme Court has recognized, "one of Congress' primary purposes in passing the Refugee Act was to implement the principles agreed to in" the 1967 Protocol and the 1951 Convention. *Negusie v. Holder*, 555 U.S. 511, 520 (2011) (quoting *INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999)).

The 1967 Protocol states that its parties "undertake to apply articles 2 to 34 inclusive of the [1951 Convention] to refugees as hereinafter defined." 1967 Protocol, 19 U.S.T. at 6225. In turn, Article 28 of the 1951 Convention requires states to "issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory" and notes that "the provisions of the Schedule to [the 1951 Convention] shall apply with respect to such documents."

1951 Convention, 19 U.S.T. at 6274. Paragraph 6 of the Schedule to the 1951 Convention ("the Schedule") provides that the "Contracting States shall give sympathetic consideration to renewing or extending the validity of travel documents or issuing new documents to refugees no longer lawfully resident in their territory who are unable to obtain a travel document from the country of their lawful residence." Schedule ¶ 6, 19 U.S.T. at 6282-83. Notably, the RTD Regulations cite Article 28 of the 1951 Convention as the basis for the RTD requirement. 8 C.F.R. § 223.1(b).

These provisions of the 1967 Protocol and the 1951 Convention clearly support the issuance of RTDs and arguably require the United States to do so. They do not, however, provide a basis to conclude that RTDs may or must be required for the reentry of a previously admitted refugee to the United States. Significantly, paragraph 14 of the Schedule states that "the provisions of this Schedule in no way affect the laws and regulations governing the conditions of admission to, transit through, residence and establishment in, and departure from, the territories of the Contracting States." Schedule ¶ 14, 19 U.S.T. at 6284. Such laws include provisions such as 8 U.S.C. § 1157(c)(3). Thus, these international agreements do not provide a basis to override the exclusions within § 1157(c)(3).

In summary, the Court concludes that Congress unambiguously intended for refugees not to be categorically inadmissible based on a lack of entry or travel documents, such that the RTD Policy's provision rendering returning refugees inadmissible based on the lack of an RTD is "not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, the Court need not address *Chevron* Step Two.

### B.     Arbitrary and Capricious

Doe separately argues that the RTD Policy should be set aside as to Doe because it is arbitrary and capricious under 5 U.S.C. § 706(2)(A). Specifically, Doe argues that the RTD Policy

27

fails to consider an important aspect of the problem at issue because it has effectively terminated Doe's refugee status without due consideration for the protections associated with that status. Although provided with two opportunities to brief this issue, as well as an opportunity to address it at the hearing, the Government has offered no argument in opposition to this claim.

Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although whether an agency has acted arbitrarily and capriciously is sometimes viewed as one component of the *Chevron* analysis of whether an agency action was "not in accordance with law," this issue is "distinct" from the question of whether the action was "manifestly contrary to the statute." *Amaya v. Rosen*, 986 F.3d 424, 432 (4th Cir. 2021) (stating that "an agency decision, even if not manifestly contrary to statute, is still unreasonable if it is 'arbitrary or capricious in substance'" (quoting *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001))); *see also Judulang v. Holder*, 565 U.S. 42, 52-53 & n.7 (2011) (applying the "arbitrary and capricious" test to an agency action that did not interpret any statutory language because "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisonmaking").

When faced with an arbitrary-and-capricious challenge, "an agency 'must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *CASA de Maryland v. DHS*, 924 F.3d at 703 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Arbitrary-and-capricious review is "highly deferential, with a presumption in favor of finding the agency action valid," but does not "reduce judicial review to a rubber stamp of agency action." *Id.* (quoting *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th

Cir. 2012)). A court must conduct a "searching and careful inquiry" of the record so that it "may consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Id.* (quoting *Friends of Back Bay*, 681 F.3d at 587). An agency rule or action will be deemed arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983).

Doe argues that the Government's RTD Policy is arbitrary and capricious in that it "entirely fail[s] to consider an important aspect of the problem." *Id.* In *State Farm*, after referencing this factor, the Supreme Court concluded that the National Highway Traffic Safety Administration ("NHTSA") acted arbitrarily and capriciously in rescinding Standard 208 ("the Standard"), which required automobile manufacturers to include passive restraints in their vehicles, for two reasons: NHTSA "gave no consideration whatever to modifying the Standard to require that airbag technology be utilized," *id.* at 46, 48, and NHTSA "was too quick to dismiss the safety benefits of automatic seatbelts." *Id.* at 51. More recently, the Supreme Court applied this *State Farm* factor in *Department of Homeland Security v. Regents of the University of California* ("*Regents*"), 140 S. Ct. 1891 (2020), in which the Court vacated DHS's decision to terminate DACA as arbitrary and capricious. *Id.* at 1901. The Supreme Court reasoned that although DACA contained at least two defining features—forbearance from being placed in removal proceedings and eligibility for benefits—by rescinding DACA based solely on its inconsistency with the INA with respect to benefits eligibility and providing "no discussion of forbearance or the option of retaining forbearance without benefits," DHS had "entirely failed to consider that important aspect of the

problem" such that on that basis alone, the rescission decision was "arbitrary and capricious." *Id.* at 1910-13 (quoting *State Farm*, 463 U.S. at 43).

Here, Doe argues that the RTD Policy is arbitrary and capricious because as to refugees who have traveled abroad without an RTD, the RTD Policy did not consider that it effectively operates to terminate their refugee status without affording the protections and applying the criteria otherwise required by law.  First, Doe presents a persuasive argument that the enforcement of the RTD Policy against her effectively terminates her refugee status.  Although Doe left the United States without having first applied for or received an RTD, the Government acknowledged at the hearing that the departure of a refugee from the United States, in and of itself, does not effectuate the termination of refugee status.  While the Government asserted at the hearing that the denial of an RTD did not formally terminate Doe's refugee status because a refugee located outside the United States may still appear at a port of entry and seek admission based on her prior refugee status, the Cooper Memorandum specifically provides that a refugee who fails to obtain an RTD "cannot be admitted," and that refugees who leave the United States without permission "are rendered inadmissible by their action."  Cooper Mem. at 2.  Moreover, it is beyond dispute that the RTD Policy, which resulted in the denial of Doe's RTD application, has had the practical effect of terminating her refugee status because Doe has no actual ability to return to the United States or reach a port of entry.  At the hearing, the parties agreed that without a travel document, airlines will not permit Doe to board a plane bound for the United States.  Where Doe is presently in Iraq, over 6,000 miles away, she has no actual ability to reach a United States port of entry.  Thus, the RTD Policy, as applied to Doe, has effectively terminated her refugee status.

Second, Doe has established that the RTD Policy imposed this result without consideration of the substantive and procedural requirements that must be followed to terminate a refugee's

status. The INA provides the specific basis for terminating refugee status: the Government may terminate refugee status pursuant to prescribed regulations if it "determines the alien was not in fact a refugee within the meaning of [8 U.S.C. § 1101(a)(42)] at the time of the alien's admission." 8 U.S.C. § 1157(c)(4). By regulation, before terminating refugee status, "USCIS will notify the alien in writing of its intent to terminate the alien's refugee status," and "[t]he alien will have 30 days from the date notice is served upon him or her . . . to present written or oral evidence to show why the alien's refugee status should not be terminated." 8 C.F.R. § 207.9. Furthermore, the USCIS Policy Manual states that the "sole basis for an officer to terminate the status of a noncitizen admitted to the United States as a refugee is if the officer determin[e]s that the noncitizen was not a refugee within the meaning of the [INA] at the time of his or her admission to the United States." USCIS Policy Manual Vol. 7, Part L, Ch. 6.A (2024), Mot. Prelim. Inj. Ex. G, ECF No. 25-8.

The RTD Policy, however, allows USCIS to deny an RTD based on entirely different considerations that do not align with the sole permissible basis for termination, that the individual was not in fact a refugee at the time of admission. *See* 8 U.S.C. § 1157(c)(4). Under the RTD Policy, when a previously admitted refugee has departed from the United States without an RTD and submits an RTD application from abroad, a USCIS officer may accept and adjudicate it if the officer: (1) is "satisfied that the alien did not intend to abandon his or her refugee or asylum status at the time of departure from the United States"; (2) the "alien did not engage in any activities while outside the United States that would be inconsistent with continued refugee or asylum status"; and (3) the "alien has been outside the United States for less than 1 year since his or her last departure." 8 C.F.R. § 223.2(b)(2)(ii). On their face, the first two criteria focus on issues other than whether the applicant was a refugee at the time that refugee status was granted and therefore are not aligned with the sole statutory basis for termination of refugee status.

31

Moreover, as discussed above, the Cooper Memorandum provides that a refugee who has left the United States without an RTD is "inadmissible," which effectively imposes a categorical exclusion from the United States without any consideration of the substantive and procedural requirements for termination. Cooper Mem. at 2. Notably, the authority cited in the Cooper Memorandum for this rule consists of 8 U.S.C. § 1182(a)(7), which is rendered inapplicable by 8 U.S.C. § 1157(c)(3), and 8 C.F.R. § 223.3(d)(ii), which provides only that an alien with a valid RTD may nevertheless be deemed inadmissible by an immigration officer, presumably based on other grounds for inadmissibility under 8 U.S.C. § 1182. *See* 8 C.F.R. § 223.3(d)(ii).

Furthermore, neither the RTD Regulations nor the Cooper Memorandum explain how these aspects of the RTD Policy are consistent with the relevant laws relating to the termination of refugee status. There is nothing in the RTD Policy, or in any other source cited by the Government, that demonstrates that there was any consideration given to whether the RTD Policy as applied to refugees who departed the United States would effectively terminate their refugee status without following the procedural and substantive requirements of 8 U.S.C. § 1157(c)(4) and 8 C.F.R. § 207.9. Indeed, at the hearing, Government counsel acknowledged that the immigration officer denying Doe's RTD application likely did not consider that a denial would effectively terminate Doe's refugee status. Although the Cooper Memorandum advises that before aiding in "the return of a refugee . . . without a travel document," "a fact-specific investigation is necessary to come to a proper conclusion on cessation of refugee status," Cooper Mem. at 7, it likewise does not consider in any way whether this process may be inconsistent with the applicable laws and required procedures for termination of refugee status.

Finally, the Court notes that in citing the statutory provisions underpinning their authority, none of the challenged RTD Regulations, 8 C.F.R. §§ 223.1–223.3, reference 8 U.S.C. §

1157(c)(1), which the Government now cites as the legal authority for the RTD Policy. The Court therefore seriously doubts whether it may uphold the RTD Policy "on the basis articulated by the agency itself," as is necessary to withstand arbitrary-and-capricious review. *CASA de Maryland v. DHS*, 924 F.3d at 703 (quoting *State Farm*, 463 U.S. at 50).

For these reasons, and where the Government has offered no counterargument to Doe's contention that the RTD Policy is arbitrary and capricious, the Court concludes that Doe has shown a likelihood of success on the merits that the RTD Policy is arbitrary and capricious as applied to Doe, a refugee who traveled outside the United States without an RTD, because it does not consider that by rendering Doe inadmissible, it effectively terminates her refugee status without complying with the applicable standard and procedures.

## V.    Irreparable Harm

Having concluded that Doe has established a likelihood of success on the merits on her APA claim, the Court turns to whether Doe has shown a likelihood of irreparable harm. The party moving for a preliminary injunction must show "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. The moving party must "make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). The harm must "be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).

Doe has made the requisite showing that she faces irreparable harm in the absence of a preliminary injunction. First, Doe has provided an uncontroverted declaration stating that she has

been subjected to verbal threats, threats with guns, and physical assaults from the Shiite militants, including being told that she is believed to be an American spy and is therefore on a hit list, and that she has scars and bruises on her body after an attack on a public street. In response, Doe has had to live in hiding. Doe has also asserted that the risk to her life in Iraq has increased in recent months due to increasing tensions between Shiite militia groups in Iraq and the United States. Where Doe faces credible threats of death or serious bodily harm, she has demonstrated likely irreparable harm.

Second, Doe has asserted in her declaration that her husband was forced to live separately from her and to take her two older children away from her to live with him, such that she rarely sees those children. As a result, Doe is enduring separation from her two children that could be resolved if she were able to return to the United States with them as refugees. Moreover, where the two older children have received RTDs, and Doe's own RTD application has been denied, Doe faces the potential that her two oldest children will need to be sent to the United States on their own before their RTDs expire on May 9, 2024, which would result in an additional, more stark form of family separation. While they could remain in Iraq after May 9, 2024 absent a preliminary injunction, they would then have forfeited their refugee status, which itself would impose a type of irreparable harm. *Cf. J.O.P. v. U.S. Dep't of Homeland Security*, 409 F. Supp. 3d 367, 379 (D. Md. 2019) (finding a likelihood of irreparable harm where, absent injunctive relief, certain children "may miss their opportunity to file for asylum all together"). The Court therefore concludes that Doe has demonstrated a likelihood of irreparable harm absent a preliminary injunction.

## VI.    Balance of the Equities and the Public Interest

The balance of the equities requires consideration of "competing claims of injury" and "must consider the effect on each party of the granting or withholding of the requested relief."

34

*Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)). "[A]ssessing the harm to the opposing party and weighing the public interest . . . merge when the Government" is the party opposing a preliminary injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, the benefit to Doe of the proposed relief is substantial in that she and her two older children may be reunited and able to return to the United States as refugees, thereby escaping threats of physical harm from Shiite militias in Iraq. Where there is a likelihood that Doe will establish either that the RTD Policy is contrary to law or arbitrary and capricious, the public interest favors an injunction because the public "has an interest in seeing its governmental institutions follow the law." *Roe v. Dep't of Defense*, 947 F.3d 207, 230-31 (4th Cir. 2020); *see League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (stating that there "is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations'") (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

Although the Government argues that an injunction that prevents enforcement of the RTD Policy against Doe may hinder its ability to secure the national border, the proposed injunction would apply only to Doe, and the Government has not provided any basis to conclude that Doe, the daughter of an Iraqi translator who was killed by Shiite militants because he assisted United States government officials or military personnel, poses any threat to national security. Moreover, the proposed injunction would not prevent USCIS from evaluating Doe's admissibility based on national security concerns and any of the other grounds for inadmissibility set forth in 8 U.S.C. § 1182, other than those from which refugees are exempt, and determining that Doe is inadmissible if any such grounds were to apply. The proposed injunction would merely remove one hurdle to

Doe's return that, in and of itself, does not grant her entry to the United States.  In that sense, the proposed injunction is "appropriately tailored" to minimize possible harm to the public interest. *Roe*, 947 F.3d at 230.  Accordingly, the Court finds that the balance of the equities and the public interest favor an injunction.

## CONCLUSION

For the foregoing reasons, Doe's Motion for a Preliminary Injunction will be GRANTED. The Court will issue a Preliminary Injunction barring enforcement of the RTD Policy against Doe, subject to the terms stated in the separate Preliminary Injunction.

Date:   May 8, 2024

THEODORE D. CHUANG
United States District Judge